IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| JAMES CUDD, SR., | CV 19-00015-H-BMM-JTJ |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| TRISTAN KOHUT and PAUL REES, | |
| Defendants. | |

Pending before the Court is the Defendants' Fed. R. Civ. P. 56 Motion for Summary Judgment.  See, (Doc. 42.)  For the reasons discussed herein, the Court recommends that the summary judgment motion be granted.

## I.     Background

A brief chronological background is set forth below, but additional facts will be developed further, as those specific details are necessary to analyze the individual claims.

Plaintiff James Cudd suffers from a complex array of medical conditions,[1] the interrelated nature of which has made treatment of Cudd's medical issues a

---

[1] See e.g., *Cudd v. State*, Cause No. CV-17-108-BLG-TJC, Or. at 18 (entered March 16, 2021) (wherein the Court acknowledged Cudd suffers from serious health conditions, not limited to vision impairment, as supported by medical records Cudd provided).

challenge for providers.  Since Cudd's admission to the Montana State Prison

("MSP), his medical issues have included, but have not been limited to: the

hepatitis-C virus ("HCV"), rheumatoid arthritis ("RA"), diabetes, dry eye

syndrome, heart problems, high blood pressure, dry skin, psoriasis, and Sjogren's

syndrome-an autoimmune disorder.[2] Cudd was treated at MSP by Dr. Tristan

Kohut from July of 2015 to July of 2017.[3]  Dr. Paul Rees began treating Cudd in

December of 2016 and has been one of Cudd's medical providers at MSP since

that time.[4]

       In September of 2012, Cudd entered MSP.[5]  Upon arrival, Cudd had an

active HCV infection.[6]  He also had high blood pressure which has been monitored

and managed with a variety of medications.[7]  At some point in 2014, Cudd

developed RA.[8]  RA is an autoimmune condition in which an individual's immune

system attacks the joint linings; it can also affect one's skin, eyes, lungs, heart,

blood, and nerves.[9]  Cudd began receiving prednisone to treat his RA in May of

---

[2] See, e.g., (Doc. 44-1 at 4, ¶ 11.); see also, (Doc. 44-2 at 4, ¶ 8.)

[3] (Doc. 44-1 at 4, ¶ 10.)

[4] (Doc. 44-2 at 3, ¶ 7.)

[5] Cudd claims he entered MSP in 2011, however, records indicate he was not sentenced until August 21, 2012.  See, Montana Correctional Offender Network: https://app.mt.gov/conweb/Offender/3010221/ (accessed May 3, 2021); see also, (Doc. 44-2 at 22, ¶ 110.)

[6] (Doc. 44-1 at 4, ¶ 12.)

[7] See, (Doc. 44-1 at 12, ¶ 68); see also, (Doc. 44-2 at 20, ¶ 103.)

[8] See, (Doc. 53-2 at 2, ¶ 5.)  But, Cudd initially claimed his RA and corresponding prednisone treatment began in 2013.  See, (Doc. 2 at 2) Dr. Belsom listed the onset RA was in 2013.  (Doc. 53-5 at 4.)

[9] (Doc. 44-1 at 4, ¶ 12; 5, ¶ 13.)

2014.[10]  Cudd has been prescribed different medications, including Enbrell and Humira, but due to allergies and intolerances to those medications, he has needed prednisone, a steroid, to manage his RA.[11]

It was noted in Cudd's medical records that in March of 2014, he began developing eye issues, including dry eye and eye pain, for which he was prescribed medication.[12]  But again, it appears that these issue may have predated 2014, at least according to Dr. Rees.[13] Although the exact date of diagnosis is unclear, Cudd has been deemed legally blind since at least May 21, 2018. Dr. Rees believes this diagnosis occurred before he began treating Cudd in December of 2016.[14]

In January of 2015, Cudd developed diabetes. Cudd's diabetes has been treated with medication, including insulin and metaformin.[15]

Cudd also claims he had a heart attack on September 16, 2015.[16]  Defendants note that on May 27, 2015, Cudd was dizzy and passed out.  Cudd was taken to the hospital where he was found to have chest pain, an increased heart rate, and

---

[10] *Id.*

[11] See, (Doc. 53-5 at 14); see also, (Doc. 44-1 at 5, ¶ 14.) See, (Doc. 53-5 at 4)(Dr. Belsom notes MTX was not effective and that Cudd had a severe drug rash to both Embrel and Humira).

[12] (Doc. 44-1 at 5, ¶ 15.)

[13] See, (Doc. 44-2 at 14, ¶ 65)(noting that Cudd has had eye issues and cataracts since he entered custody in 2012.)

[14] See, (Doc. 38-1 at 1)(Dr. Nedrud's letter to the Court in Cause No. 1:17-cv-108-BLG). Cudd claims this diagnosis came in December of 2016,  (Doc. 15 at 2), which would coincide with Dr. Rees' recollection. See, (Doc. 44-2 at 15, ¶ 68.)

[15] (Doc. 44-1 at 11, ¶ 51); (Doc. 44-2 at 14, ¶ 61.)

[16] (Doc. 15 at 1.)

elevated blood sugar levels.[17]  Defendants do not believe that Cudd has suffered a heart attack while in their care.

Beginning in July of 2015, Cudd was prescribed Tramadol for pain management.[18]  In March of 2016, Cudd was prescribed an additional dose of Tramodol.[19]  In 2016, Cudd also saw an infectious disease specialist regarding potential treatment for his HCV.[20]

Additionally, in 2016, Cudd began having increased difficulty with his eyes and vision.  In December of 2016 a corneal ulcer in Cudd's right eye perforated as a result of rheumatologic melt caused by his RA.[21] During this time period, Cudd began outside treatment with Dr. Chad Nedrud of the Rocky Mountain Eye Center.[22] Throughout the winter of 2016-2017, Dr. Nedrud saw Cudd multiple times to glue his cornea in an effort to seal the leak.  Dr. Nedrud ultimately performed a tarsorrhaphy.[23]  It was noted that Cudd's eye issue was difficult to treat because Cudd's active HCV diagnosis prevented him from taking certain medications for his RA.  Accordingly, Cudd was continued on prednisone, but it

---

[17] (Doc. 44-2 at 20, ¶ 104.)
[18] (Doc. 44-1 at 10, ¶ 49.)
[19]  See, (Doc. 44-1 at 10 paras. 49-50.)
[20] (Doc. 15 at 1.)
[21] See, (Doc. 44-1 at 11, para. 55); (Doc. 44-2 at 15, ¶ 66); see also, (Doc. 53-3 at 4, ¶ 68.)
[22] See e.g., (Doc. 38-1.)
[23] *Id*., See also., *Cudd v. State*, Cause No. CV-17-108-BLG-TJC, Or. at 19-20 (entered March 16, 2021)(discussing Cudd's eye procedures from December  2016 to March 2017, also explaining that a tarsorrhaphy is a procedure in which the eyelids are partially sewn together narrowing the eye opening.  See, *Id*. at 20, f.n. 80.

was hoped that in the future, once the HCV cleared, Cudd could begin more effective treatment for his RA.[24]

In February of 2017 Dr. Kohut approved treatment for Cudd's HCV, but the treatment first had to be approved by a third party.[25]  Because such HCV treatments were novel to the prison, MSP needed to develop internal protocols for the administration of the HCV treatments.[26]  In June of 2017, Cudd started on Sofosbuvir and Simeprevir to treat his HCV.[27]  In July of 2017, Cudd was switched to Harvoni, which was prescribed by Dr. Kohut.[28]

In October of 2017, Cudd's Tramodol pain prescription was altered slightly.[29]  On October 4, 2017, Cudd again saw Dr. Nedrud who diagnosed Cudd with age-related cataracts.  It was recommended that Cudd receive eye surgery when he was medically stable.[30]  Cudd was informed that his RA would need to stabilize before considering a cornea transplant, otherwise there would be a high risk of graft rejection.  Dr. Nedrud also noted that there was a need for the HCV to clear from Cudd's system so that he could be placed on a steroid-sparing agent for his RA.[31] In November of 2017, HCV was no longer detected in Cudd's system.

---

[24] See, (Doc. 44-1 at 7, ₽ 25; 12, ₽ 62); see also, (Doc. 44-2 at 16, ₽ 75.)
[25] (Doc. 44-1 at 6, ₽ 23); (Doc. 44-2 at 4, ₽ 12.)
[26] See, (Doc. 44-2 at 8, ₽ 36.)
[27] (Doc. 44-1 at 7, ₽ 27); (Doc. 44-2 at 5, ₽ 14.)
[28] (Doc. 44-1 at 7, ₽ 28.)
[29] (Doc. 44-2 at 11, ₽ 47.)
[30] (Doc. 44-2 at 18, ₽₽ 88-89.)
[31] See, (Doc. 53-5 at 25-27.)

On December 28, 2017, Cudd had cataract surgery on his left eye.[32]

In January of 2018, as was customary at the time, Cudd was placed on a "drug holiday" from opiates.  The practice was used for all patients who were on chronic opiate therapy[33]  From March 17, 2018, to March 30, 2018, Dr. Rees prescribed Cudd 200 mg. of Tramodol every other day for 14 days.[34]  In 2018 all MSP inmates were apparently transitioned to a multimodal approach to pain management in which inmates were provided education and gently weaned off of opiates and addictive neuromodulators, while simultaneously being provided with non-opiate alternatives.[35]

In March of 2018, Dr. Rees noted that since Cudd's HCV had cleared, a specialist might refer Cudd for biologic therapy, in lieu of prednisone, for his RA.[36]  After consulting with rheumatology specialist, Dr. Rebecca Belsom of the Western Montana Clinic, and an endocrinology specialist, Dr. John McKenna of Community Hospital of Anaconda, in August of 2018, Cudd was stared on Orencia, a steroid-sparing agent.  Cudd was also advised to begin tapering his use of prednisone.[37]  Dr. Belsom noted that Cudd's diabetes was worsening due to prednisone.  She suggested after 4 weeks of being on Orencia, that Cudd start

---

[32] See, (Doc. 44-2 at 19, ¶ 93); see also, (Doc. 53-2 at 2, ¶ 13); see, (Doc. 53-3 at 5, ¶ 101.)
[33] (Doc. 44-2 at 11, ¶ 51.)
[34] (Doc. 44-2 at 11, ¶ 53.)
[35] See, (Doc. 44-2 at 12-13)(providing further explanation of the program utilized).
[36] (Doc. 44-2 at 6, ¶ 22.)
[37] (Doc. 53-5 at 4-5); (Doc. 44-2 at 7, ¶ 24.)

gradually tapering his prednisone by 5 mg. each month.[38]  When Cudd began

Orencia, he was on 40 mg. of prednisone daily.[39]  In December of 2018, it was

noted that Cudd was tapering his prednisone differently than prescribed and, as a

result, it was making his glucose intolerance worse.[40]  Cudd asserts that he always

tapered correctly, but that he could not go below 10 mg. of prednisone without

becoming sick.[41]

In December of 2018, Cudd was admitted to the infirmary for an abdominal

wound and he was treated with Norco, an opiate.  Cudd advised Dr. Rees that he

was having decreased pain relief with Norco.  Dr. Rese observed Cudd had

developed an opiate tolerance and discussed this issue with Cudd.[42]

On February 14, 2019, Dr. Nedrud corresponded with Cudd.  Dr. Nedrud

advised Cudd that continued use of oral prednisone was leading to macular

edema.[43]  Dr. Nedrud advised Cudd that if he could get off of oral prednisone, his

macular edema might resolve and, correspondingly, his central vision may

improve.[44]  Dr. Nedrud also informed Cudd that cataract removal in his right eye

---

[38] (Doc. 53-5 at 4.)
[39] *Id*. at 5.
[40] (Doc. 44-2 at 7, ¶ 31.)
[41] (Doc. 53-2 at 3.)
[42] See, (Doc. 44-2 at 12, ¶¶ 54-56.)
[43] Macular edema is the build-up of fluid in the macula, an area in the center of the retina.  This fluid buildup causes the macula to swell and thicken, which distorts vision.  See, National Eye Institute, https://www.nei.nih.gov/learn-about-eye-health/eye-conditions-and-diseases/macular-edema (accessed May 4, 2021).
[44] (Doc. 53-5 at 22.)

might lead to adequate vision, including his peripheral vision.[45]  Cudd was

informed that a corneal transplant could be performed at some future date, but the

first recommendation would be for cataract surgery in the right eye.[46]

By August of 2019, Cudd had tapered down to 7 milligrams of prednisone.[47]

On September 9, 2019, Dr. Rees noted Cudd was again experiencing corneal melt

in his right eye; an urgent referral was made to Dr. Nedrud.[48]  On October 13,

2019, Cudd sent out a kite stating it had been over two weeks since he had seen Dr.

Nedrud and he requested that his prednisone be refilled.  Dr. Rees responded to

Cudd's medical request.[49]

Following the corneal melt incident, by October 25, 2019, Cudd was back on

a 60 mg. dose of prednisone.[50]  Dr. Belsom noted that Orencia was "clearly not

adequate" and should not be prescribed to Cudd for his RA.[51]  Dr. Belsom stated

that Cudd would work with medical providers to lower his prednisone gradually

back to 20 mg, but that he may never get off prednisone.  Dr. Belsom noted Cudd

should be switched to Simponi.[52]  In November of 2019, Cudd was switched to

---

[45] *Id*.
[46] *Id*.
[47] (Doc. 53-5 at 6)(Dr. Rees' notes).
[48] (Doc. 44-2 at 17, ⁋ 77.)
[49] See, (Doc. 53-5 at 24.)
[50] (Doc. 53-5 at 3.)
[51] *Id.*
[52] *Id.*

Simponi, which was prescribed by Dr. Rees.[53]

## II.     Cudd's Claims

Cudd claims that both defendants violated his Eighth Amendment rights and subjected him to cruel and unusual punishment.[54]  As to Dr. Kohut, Cudd claims that he knew or should have known of the dangers associated with prednisone, yet refused to lower the dosage, which contributed further to Cudd's vision problems.[55]  Cudd asserts Dr. Kohut's prednisone treatment was not monitored or controlled, resulting in further problems to Cudd, and that Dr. Kohut failed to reduce the amount of prednisone administered to Cudd prior to leaving MSP.[56]  Cudd also claims Dr. Kohut delayed in providing medical treatment and in scheduling Cudd's surgery.[57]

As to Dr. Rees, Cudd alleges that he was negligent in following through with necessary eye surgery, demonstrating deliberate indifference.  Additionally, according to Cudd, Dr. Rees failed to attempt to prevent further illness to Cudd after taking over for Dr. Kohut and failed to provide care, all amounting to cruel and unusual punishment.[58]

//

---

[53] (Doc. 44-2 at 8, ¶¶ 33-34.)
[54] (Doc. 15 at 1.)
[55] *Id*. at 2.
[56] *Id.*
[57] *Id*. at 3-4.
[58] *Id*. at 4.

### III.    Summary Judgment Standards

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party.  *Id.*  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the non-moving party's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *Id.* at 322-23.  If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the non-moving party's evidence.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252). In deciding a motion for summary judgment, however, the Court views the evidence in the light most favorable to the non-moving party and draws all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007). Also, because Cudd is proceeding pro se, the Court must construe his documents liberally and give them "the benefit of any doubt" with respect to Defendants' summary judgment motions. *Frost v. Symington*, 197 F.3d 348, 352 (9th Cir. 1999). *See also Erickson v. Pardus* 551 U.S. 89, 94 (2007).

## IV.    Discussion

### Medical Care- Eighth Amendment Standards

As set forth above, Cudd alleges that Defendants violated his Eighth Amendment right to be free of cruel and unusual punishment by interfering with or delaying medical treatment in the following ways: (1) improperly prescribing and failing to reduce prednisone; (2) failing to follow the recommendations of Dr. Nedrud and failing to timely schedule eye surgery; and, (3) failing to prescribe adequate pain medication.[59]

The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and "deliberate indifference to serious medical needs of prisoners constitute the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  This indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id*. at 104-05.

The Ninth Circuit employs a two-part test for deliberate indifference.  "First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the

---

[59] See generally, Amd. Cmplt. (Doc. 15.)

unnecessary and wanton inflicton of pain.  Second, the plaintiff must show the defendant[s'] response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F. 3d 1113, 1122 (9th Cir. 2012), quoting *Jett v. Penner*, 439 F. 3d 1091, 1096 (9th Cir. 2006).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Indications that a prisoner has a serious need for medical treatment are the following:  the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.  *Wood v. Housewright*, 900 F.2d 1332, 133741 (9th Cir. 1990) (citing cases); *Hunt v. Dental Dept.*, 865 F.2d 198, 200–01 (9th Cir. 1989); *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds, WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).  The Court will presume for purposes of these Recommendations that Cudd has serious medical needs.

Once there is a showing of a serious medical need, a plaintiff must show that a defendant was deliberately indifferent to that need.  In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court established a demanding standard for "deliberate indifference."  Negligence is insufficient.  *Farmer*, 511 U.S. at 835.

Deliberate indifference is established only where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal citation omitted). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).

A physician need not fail to treat an inmate altogether to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.*

### i.    Failure to Properly Prescribe and Reduce Prednisone

As set forth above, Cudd entered custody in 2012 with an active HCV infection. Cudd also suffers from severe RA. Historically, Cudd's RA has been managed and treated with prednisone, among other medications. This use of prednisone was made, in part, because of Cudd's allergies and intolerances to other RA medication, including Enbrell, Humira, and methotrexate.[60] But, Cudd's HCV diagnosis also complicated the treatment of his RA. While other therapies, in

---

[60] See e.g., (Doc. 53-5 at 14); (Doc. 44 at 5, ⁋ 21.)

particular biologic therapies, are available to treat RA, use of biologic therapy is contraindicated while one has an active HCV infection.  Accordingly, it was necessary for Cudd to clear his HCV infection prior to trying different medications to treat his RA.

Cudd was recommended for HCV treatment in February of 2017.  This recommendation was referred to MSP officials for approval under the newly developed procedures regarding inmate HCV treatment.  In consultation with an Infectious Disease Specialist, Dr. Joshua Christensen, Cudd started HCV treatment on June 21, 2017.[61]  On July 27, 2017, Dr. Christensen approved MSP's request to switch Cudd to Harvoni.[62]  In November of 2017, testing indicated that HCV was no longer present in Cudd's system.

Once the HCV was cleared, Cudd was then eligible to be considered for biologic therapies to treat his RA.  After consulting with outside professionals, including Dr. Belsom and Dr. McKenna, Cudd began on Orencia.  Although Cudd claims that he was prescribed unsafe dosages of prednisone, he has pointed to no medical records or opinions indicating that outside providers disagreed with Dr. Kohut or Dr. Rees' prescribing prednisone to Cudd or with the dosage amounts prescribed.  Further, Cudd initially attempted to have this Court believe that

---

[61] (Doc. 53-5 at 2.)
[62] *Id.*

medical staff at Johns Hopkins recommended that Cudd be taken off prednisone and that Dr. Rees failed to comply with this recommendation.[63]  But, later Cudd contradicted himself and stated that he never claimed to be seen by Johns Hopkins and that he only provided information to the infirmary regarding the side effects of prednisone which he received from John Hopkins Vasculitis Center.[64]

Likewise, Cudd indicates that Dr. Nedrud opined that Dr. Kohut and Dr. Rees had been deliberately indifferent to Cudd's medical treatment.[65]  But, Cudd provides no information or records which would support his contention that either defendant ignored recommendations from outside providers or that any other providers suggested that prescribing Cudd prednisone to treat his RA was not medically necessary.  In 2019, Dr. Nedrud informed Cudd that if he was able to taper off of his oral prednisone, his macular edema may improve.  Thus, contrary to Cudd's assertions, Dr. Nedrud also seemingly supported the tapering of prednisone in order to curb its unwanted side-effects, but there is no indication that Dr. Nedrud found the drug to be medically unnecessary.

Additionally, contrary to Cudd's assertion, it was not just Dr. Rees that thought tapering Cudd's dose of prednisone in the late summer/fall of 2018 was appropriate, Dr. McKenna and Dr. Belsom not only concurred, but also assisted in

---

[63] See, (Doc. 15 at 3, ¶¶ 20, 23.)
[64] (See, (Doc. 53-3 at 4, ¶ 86.)
[65] (Doc. 15 at 3, ¶ 16.)

16

developing this plan.[66]  Another provider at MSP instructed Cudd on tapering his

prednisone.[67]  In December of 2018, Dr. Rees discovered Cudd was not tapering

his prednisone as directed, but instead was self-dosing, depending on how he felt.[68]

Contrarily, Cudd asserts he always properly tapered off prednisone, but that he

could not go below 10 mg. without getting sick.[69]

Throughout 2019, it appears that Cudd continued to taper his prednisone use.

In August of 2019, he was down to a 7 mg. dose, but unfortunately the corneal

melt in his right eye re-occurred.  It was at that point that it was determined that

Orencia was inadequate to treat Cudd's RA and he was switched to Simponi.  In

order to treat Cudd's corneal melt issue, his dose of prednisone was sharply

increased.

Cudd also claims that neither Defendant advised him of the side effects of

long-term prednisone use; a contention which both defendants dispute. Dr. Kohut

states he repeatedly discussed the potential side effects of long-term prednisone

use, including the potential risk of developing Diabetes Mellitus Type II with

Cudd.[70]  Dr. Rees relates he repeatedly discussed with Cudd the potential side

effects of long-term prednisone use, which include bone demineralization, high

---

[66] Cf., (Doc. 53-5 at 3); with (Doc. 53-3 at 2, P 26); (Doc. 44-2 at 6-7.)
[67] See, (Doc. 44-2 at 7, P 28.)
[68] (Doc. 44-2 at 7-8.)
[69] See, (Doc. 53-2 at 3.)
[70] (Doc. 44-1 at 9, P 42.)

blood sugar, immune suppression, and adrenal insufficiency.[71]  Regardless, it appears Cudd was well aware of the potential side effects of prednisone as Cudd himself apparently supplied materials outlining such effects to Dr. Rees.[72]

Cudd has not shown that a genuine dispute of material fact exists as to whether Defendants were deliberately indifferent to a serious medical need.  "A prison official is deliberately indifferent under the subjective element of the test only if the official 'knows of and disregards an excessive risk to inmate health and safety.'"  *Colwell v. Bannister*, 763 F. 3d 1060, 1066 (9th Cir. 2014), quoting *Toguchi v. Chung*, 391 F. 3d 1051, 1057 (9th Cir. 2004).  "This requires more than ordinary lack of due care.'"  *Id*., quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*., quoting *Farmer,* 511 U.S. at 837.

Based upon a review of the record, it appears that Cudd's prednisone prescription and corresponding RA treatment- which has included administration of Humira, Enbrell, methotrexate, Prednisone, Orencia, and Simponi- has been monitored and adjusted repeatedly, in consultation with medical providers outside of MSP, over the years.  Moreover, such adjustments were necessary given Cudd's

---

[71]  (Doc. 44-2 at 9, ¶ 40.)
[72] See, (Doc. 15 at 3, ¶ 20); (Doc. 53-5 at 8-13.)

intolerance for certain medications and the complexity of his health issues.
Biologic RA therapies could not be initiated until Cudd was cleared of HCV.  This
meant that while Cudd's HCV was active, the only suitable treatment for his RA
was with prednisone.  Cudd concedes that he received proper medical attention and
treatment for HCV.[73]

Once Cudd's HCV cleared, Dr. Rees consulted with specialists and a course
of biologic therapy began.  Again, given Cudd's complex health history, outside
providers have opined that Cudd may never be able to get completely off of
prednisone.[74]  There is nothing in the record to suggest that any other provider
believed either defendant was improperly overprescribing prednisone to Cudd.
Moreover, continued efforts have been made to attempt to reduce Cudd's
prednisone dosage.  In short, the record demonstrates that Cudd's medical
providers, including Defendants, exercised due care in an ongoing effort to treat
and control his RA.

As set forth above, long-term prednisone use is known to have side-effects.
Cudd claims that by Defendants over-prescribing prednisone, he now suffers from:
diabetes, loss of teeth, heart failure, loss of bone density, and loss of mobility.

---

[73] See, (Doc. 53-6 at 4, ¶ 69.)
[74] See e.g., treatment note from Dr. Belsom (Doc. 53-5 at 3); see also, (Doc. 38-1 at 1)(Dr.
Nedrud letter opining that Cudd's RA will likely involve a lifetime of treatment, including
prednisone).

There is indication that Cudd's diabetes worsened due to prednisone.[75] As set forth above, there are known side effects of the drug.  Defendants point out that, in addition to long-term prednisone use, there are likely other contributing factors to Cudd's diabetes and high blood sugar, including: routine non-compliance with dietary recommendations; routine refusal to take recommended and prescribed insulin, and long-term inactivity.  Similarly, Defendants acknowledge that in a July 2019 test, it was revealed that Cudd had low bone density at one or more skeletal sites.  In addition to prednisone use, however, Defendants noted Cudd possesses other traits that potentially affect his bone density and propensity for fractures including: obesity, long-term inactivity, and age-related bone-density loss.[76] Additionally, Cudd's 10-year risk of fracture was calculated at less than the threshold where pharmacological therapy is recommended by the National Osteoporosis Foundation.[77]

Aside from Cudd's own conclusory assertions, he has provided no evidence to the Court that the other medical conditions of which he complains, are a direct result of inappropriate prednisone prescription or dosage.  Moreover, Cudd has not shown that either defendant knew of an excessive risk to his health caused by prednisone and disregarded such risk.  Put another way, Cudd has not shown that

---

[75] See e.g., (Doc. 53-4 at 4-5.)
[76] See, (Doc.   44-1 at 9, ⁋ 43); see also, (Doc. 44-2 at 9, ⁋ 41.)
[77] (Doc. 44-2 at 20-21, ⁋ 105.)

either defendant failed to respond to his medical need and that harm resulted.  See,
*Jett*, 439 F.3d at 1096. Accordingly, a reasonable jury would not find that
Defendants were deliberately indifferent to Cudd's serious medical need; summary
judgment should be granted on this claim.

### ii.    Failure to Follow Dr. Nedrud's Recommendations and Schedule Eye Surgery

Cudd next alleges that Defendants denied him surgery on his right eye.  "An
inmate challenging a denial of treatment must [show] that the denial 'was
medically unacceptable under the circumstances,' and made 'in conscious
disregard of an excessive risk to [the inmate]'s health.  *Rosati v. Igbinoso*, 791 F.
3d 1037, 1039 (9th Cir. 2015) (quotations omitted).

As set forth above, Cudd began treatment with Dr. Nedrud on December 19,
2016, for the corneal ulcer in his right eye, which had perforated.[78] On December
23, 2016, Dr. Nedrud glued Cudd's perforated corneal ulcer.[79]  On January 10,
2017, Dr. Nedrud again glued Cudd's cornea and noted that the corneal perforation
was improving with glue.[80]  On January 25, 2017, Dr. Nedrud glued Cudd's cornea
and noted that Cudd had a persistent corneal melt in his right eye that was still
leaking, despite having been glued.[81]  Also in January of 2017, Dr. Kohut advised

---

[78](Doc. 44-1 at 11, ℙ 55); (Doc. 44-2 at 15, ℙ 66.)
[79] (Doc. 44-1 at 11, ℙ 56); see also, (Doc. 44-2 at 15, ℙ 67.)
[80] (Doc. 44-1 at 12, ℙ 57); see also, (Doc. 44-2 at 15, ℙ 69.)
[81] (Doc. 44-1 at 12, ℙ 58); see also, (Doc. 44-2 at 15, ℙ 70.)

Dr. Nedrud that he was trying to get approval for Cudd's HCV treatment.[82]

On February 1, 2017, Dr. Nedrud surgically narrowed Cudd's right eyelid opening and noted that Cudd's corneal perforation was still active.[83]  On March 8, 2017, Dr. Nedrud glued Cudd's ulcer to prevent corneal leaking.  Dr. Nedrud advised Defendants that Cudd needed HCV treatment so he could start a steroid-sparing agent.  Dr. Kohut told Dr. Nedrud that he was actively trying to get approval for Cudd's HCV treatment.[84]  On April 3, 2017, Dr. Rees ordered a follow-up appointment with Rocky Mountain Eye Clinic.[85]  On April 4, 2017, MSP received a letter from Dr. Nedrud stating the corneal ulceration in Cudd's right eye was due to his RA; Dr. Nedrud noted that treatment of RA was complicated by Cudd's HCV diagnosis.  Dr. Nedrud also noted that Cudd was trying to get approval for HCV treatment so he could start more effective treatment for his RA.[86]  A surgery on Cudd's right cornea was scheduled for May 18, 2017, but Cudd was unable to have surgery on that day because he was hospitalized with influenza B.[87]  As discussed above, it was also during this time period that Cudd was in the process of being approved for HCV treatment.

On October 4, 2017, Cudd saw Dr. Nedrud.  Dr. Nedrud diagnosed age-

---

[82] (Doc. 44-1 at 12, ⁋ 59.)
[83]  (Doc. 44-1 at 12, ⁋ 60); see also, (Doc. 44-2 at 15, ⁋ 71.)
[84] (Doc. 44-1 at 12, ⁋ 61.)
[85] (Doc. 44-2 at 16, ⁋ 74.)
[86] (Doc. 44-1 at 12, ⁋ 62); see also, (Doc. 44-2 at 16, ⁋ 75.)
[87] (Doc. 44-1 at 13, ⁋ 63); see also (Doc. 44-2 at 18, ⁋ 87

related cataracts and approved Cudd for cataract surgery when he became medically stable.[88]  On October 5, 2017, Dr. Rees noted that Cudd's cataract surgery would wait until he was finished with his Harvoni treatment.[89]  On October 30, 2017, Cudd had a follow-up regarding his cataract surgery.  Dr. Nedrud recommended that the cataract surgery wait until Cudd's blood sugar was stable.[90]  On November 17, 2017, Dr. Rees asked that Cudd's cataract surgery be scheduled.[91]  On December 28, 2017, Cudd had a cataract surgery on his left eye and saw Dr. Nedrud for a post-operative visit.[92]   On January 23, 2018, and again on March 21, 2018, Cudd saw Dr. Nedrud for post-operative visits.[93]

On May 21, 2018, in a letter to this Court relating to Cudd's habeas matter, Dr. Nedrud noted that Cudd's eye treatment had been complicated due to his RA and HCV.  Dr. Nedrud indicated he was hopeful that since the HCV had been cured, Cudd was under the care of a rheumatologist and working to get on other medications, aside from a high dose of prednisone, to stabilize his right eye and continue treatment:

> His cornea has now been stable over the past year.  We have been waiting for him to get on a secondary immunomodulator other than oral prednisone in order to safely perform a cornea transplant on the right eye and begin the rehabilitation process of the eye.  Cornea transplant takes approximately one

---

[88] (Doc. 44-2 at 18, ¶ 88.)
[89] *Id*. at 18, ¶ 89.
[90] (Doc. 44-2 at 18, ¶ 90.)
[91] *Id*. at 19, ¶ 91.
[92] *Id*. at 19, ¶ 93.
[93] *Id*. at 19, ¶¶ 94-95.

year to heal and stabilize.  After that, he can then proceed with having the cataract removed, which would ultimately give him better vision in the eye. Currently he has light perception vision in the right eye, which makes it legally blind and not a useful eye.  His left eye suffers from severe dry eye secondary to longstanding rheumatoid arthritis.  The left eye has had cataract surgery, which did benefit the eye quite a bit, but he is still essentially legally blind in that eye due to the severity of his dry eye.  He will need long-term treatment with close rheumatology follow up to better control his rheumatoid arthritis.  Once the systemic medications are started and his arthritis is better controlled then we may get a better handle on his eyes.  If his surface problems improve, we can then proceed with a cornea transplant followed by cataract surgery.  This is a lifetime of treatment as the rheumatoid arthritis is likely to continue throughout James' life.  He has a lifetime risk of further melting and severe dry eye, which can only be controlled systemic anti-inflammatories like prednisone and immunomodulators.

Dr. Nedrud indicated that once more aggressive RA management was undertaken, Cudd could hopefully undergo surgery in the near future.[94]

On July 31, 2018, Dr. Nedrud had a three-month follow-up with Cudd.[95]  As set forth above, it was during this same time period that Cudd was being seen by Dr. Belsom and Dr. McKenna and ultimately began Orencia and was advised to taper his prednisone.

In his February 14, 2019, correspondence, Dr. Nedrud again expressed concern about Cudd's continued use of oral prednisone and noted that such use was causing macular edema.[96]  Dr. Nedrud advised Cudd that if he could somehow

---

[94] See, (Doc. 38-1 at 1.)
[95] (Doc. 44-2 at 19, ¶ 97.)
[96] See, (Doc. 38-1 at 2.)

get off oral prednisone he may have resolution of the macular edema and of his central vision.  Dr. Nedrud also seemed to change his opinion regarding the course of treatment and opined that cataract surgery on the right eye may be in Cudd's best interest, followed potentially at some later date by a corneal transplant.[97]  Dr. Rees reviewed these recommendations.[98]

A theme running through Dr. Nedrud's consultations with Cudd was stability.  Whether the corneal transplant or the cataract surgery was performed first, Dr. Nedrud wanted Cudd's right eye to be stable prior to proceeding with either surgery.  But, as discussed above, during this same time period, Cudd was tapering his prednisone and was on Orencia.  The Orencia was not meeting Cudd's medical needs, as evidenced by the corneal melt that reoccurred in early September of 2019 and resulted in an urgent referral back to Dr. Nedrud.[99]  Accordingly, at no point in time during the relevant period was Cudd's right eye stable.

Moreover, although Dr. Nedrud continued monitoring and treating Cudd, and made recommendations about potential courses of future surgical intervention, there is no indication in the record that he made an actual referral for surgery on the right eye.  As such, there is no indication that either Dr. Kohut or Dr. Rees denied, delayed, or interfered with Dr. Nedrud's medical treatment.  Based on the

---

[97] *Id.*

[98] (Doc. 44-2 at 19, ¶ 98.)

[99] (Doc. 44-2 at 17, ¶ 77.)

record before the Court, it appears both Defendants followed the guidance of Dr. Nedrud.  Thus, Cudd has not demonstrated the existence of a deliberate indifference to a serious medical need.  *Estelle*, 429 U.S. at 104-05; see also, *Broughton v. Cutter Labs*., 622 F. 2d 458, 459-60 (9th Cir. 1980).  And even if Cudd could establish the Defendants exhibited mere indifference or negligence toward his eye and surgical needs, which he has not done, such a showing would be insufficient.  *Broughton*, 622 F. 2d at 460.  Accordingly, no genuine issue of facts exists regarding whether Defendants were deliberately indifferent to Cudd's serious medical needs.  Summary judgment should be granted in Defendants' favor.

### iii.    Failure to Prescribe Adequate Pain Medication

As set forth above, from 2015 to 2018, Cudd was prescribed Tramadol for pain.  In December of 2018, Dr. Rees prescribed Cudd Norco while he was in the infirmary for pain associated with an abdominal wound.[100]  Cudd complained of decreasing pain relief with Norco and Dr. Rees and Cudd discussed opiate tolerance.  Dr. Rees noted Cudd had developed opiate tolerance.[101]  As discussed above, during this corresponding time period, all MSP inmate patients were being transitioned to a multimodal approach to pain management.  MSP inmates were

---

[100] (Doc. 44-2 at 12, ¶¶ 54-55.)
[101] *Id*. at 12, ¶¶ 55-56.

slowly weaned off of opiates and other addictive medications, while simultaneously being provided education and non-opiate alternative treatments. MSP has since achieved an opiate-free chronic, non-cancer pain management plan of care.[102] Opiates are available to patients upon admission to the infirmary.

Dr. Rees asserts that Cudd has repeatedly refused to be admitted to the infirmary to receive opiate pain management.[103]  Dr. Rees further explains that because Cudd has non-malignant chronic pain, his pain has been treated with steroids, non-steroidal anti-inflammatory drugs, biologic agents, and medical attempts to control his diabetes.[104] Cudd acknowledges opiates are available in the infirmary, but believes he should not have to sit in the infirmary in order to be provided with adequate pain control.[105]

In essence, Cudd alleges Defendants refused to provide him medications which had previously proven effective for him.  Such allegations, however, are is insufficient to establish an Eighth Amendment claim.  Differences in judgment as to appropriate medical diagnosis and treatment between an inmate and prison medical providers—or, for that matter, between medical providers—are not enough to establish a deliberate indifference claim.  *Sanchez v. Vild*, 891 F.2d 240,

---

[102] See e.g., *Id*. at 12-13.
[103] *Id*. at 12, ℙ 59.
[104] *Id*. at 14, ℙ 60.
[105] See, (Doc. 52 at 2, 4); see also, (Doc. 53-2 at 3.)

242 (9th Cir. 1989).  "A difference of medical opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim."  *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

Therefore, the fact that Cudd disagrees with Defendants' decision not to provide him with certain pain medications, specifically opiates, does not plausibly support an Eighth Amendment claim.  Instead, "to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health."  *Toguchi*, 391 F.3d at 1058 (alteration omitted) (*quoting Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).  That is, Cudd must demonstrate that Defendants' decision to offer alternative medications instead of the medications Cudd preferred was medically unacceptable and done in conscious disregard to Cudd's health.  But Cudd has failed to present evidence to establish that the medications offered were medically unacceptable or done in deliberate indifference of his medical needs.

Accordingly, Cudd has not met his burden under the applicable Eighth Amendment standards.  Defendants should be granted summary judgment.

## V.    Conclusion

In sum, Cudd has provided no evidence from which it can be inferred that

the Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.  Because the Defendants' Motion for Summary judgment on Cudd's Eighth Amendment claims should be granted, it is unnecessary to address Defendants' alternative argument that they are entitled to qualified immunity.

Based on the foregoing, the Court makes the following:

<b>RECOMMENDATION</b>

1.      Defendant's Motion for Summary Judgment (Doc. 42) should be GRANTED.

2.      The Clerk should be directed to enter judgment and close this matter.

3.      The Clerk of Court should also be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

<b>NOTICE OF RIGHT TO OBJECT TO<br>FINDINGS & RECOMMENDATIONS AND<br>CONSEQUENCES OF FAILURE TO OBJECT</b>

The parties may file objections to these Findings and Recommendations within fourteen days after service.  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of

Appeals.  Any notice of appeal pursuant to Fed.R.App.P.  4(a), should not be filed until entry of the District Court's final judgment.

DATED this 4th day of June, 2021.


*/s/ John Johnston*
John Johnston
United States Magistrate Judge